LETTS, Judge.
At issue, in this mortgage foreclosure action, is whether a true purchase money mortgage, executed simultaneously with a warranty deed, but delayed of recording in the public records, takes precedence over other subsequently executed mortgages which are, however, recorded first. We reverse the summary judgment entered in favor of the seller/purchase money mortgagee.[1]
The purchase and sale agreement for this improved real estate called for a $410,-000 purchase price, to be paid at closing with $100,000 in cash and $310,000 by way of two purchase money mortgages executed by the buyer in favor of the seller. At closing, the deed and the two purchase money mortgages (labeled respectively as “first” and “second” mortgages) were simultaneously executed, but, for undis *936 closed reasons, neither the deed nor the “first” purchase money mortgage were recorded until nearly two weeks later. Moreover, the “second” purchase money mortgage was, inexplicably, not recorded until some six weeks after the closing. Meanwhile, the buyer corporation was busy indeed! On the same day as the closing, but subsequent to it, the buyer executed, as the new owner of the property, nine other mortgages in favor of various investors. Thereafter, in the space of less than a week, fourteen more mortgages were executed in favor of a total twenty-three separate investors who, among them, paid cash in the sum of $235,000 for their investments in what were described as “equal dignity” mortgages. Thus, over and above a $100,000 cash down payment, a total of $545,000 in mortgage indebtedness was incurred within a week of the sale of the property for only $410,000. These twenty-three other investment mortgages bore the legend that they were also “second” mortgages and all of them were recorded, seri-atim, nearly two weeks later on the same date as the deed and the “first” purchase money mortgage, but at a later moment in time, according to the recording clock. All of the foregoing documents were depicted as having been recorded by “Sun Coast”, a title company listed at the same address as the buyer corporation.[2]
The deed from the seller and the two purchase money mortgages in her favor were likewise depicted as having been recorded by Sun Coast Title, but, in addition, indicated that they had been prepared by it “as a necessary incident of the fulfillment of conditions contained in a title insurance commitment.” The twenty-three investment mortgages were all prepared by one Terri D’Addario, who is otherwise unidentified in the record except that she also is listed at the same address as the buyer corporation and the title company.
The buyer corporation has since filed for bankruptcy in federal court. One of the disputes in that forum concerns the priority of these various mortgages and the bankruptcy court has left it to our state court system to determine whether the second purchase money mortgage, executed in favor of the seller, has priority over the twenty-three investment mortgages executed by the buyer in favor of the investors. It is the resolution of that task which we now address, but find cannot be resolved by way of summary judgment.
We begin by noting that of the two purchase money mortgages, there is no question but that the first for $100,000 is superior to the twenty-three investors’ mortgages because it was executed and recorded on a prior date. However, the second of these two purchase money mortgages,[3] in the sum of $210,000, was not recorded until January 25th, 1984, whereas the twenty-three equal dignity mortgages were all recorded on December 21st, 1983, over one month earlier. This being so, the twenty-three investors claim priority for their “second” mortgages over the “second” purchase money mortgage in favor of the seller by reason of section 695.01, Florida Stat *937 utes (1987). That section provides, in pertinent part, that “no ... mortgage ... shall be good and effectual in law or equity against creditors or purchasers for a valuable consideration and without notice, unless the same be recorded according to law.” Unquestionably, in the record, these twenty-three investors were purchasers for a valuable consideration and they were without individual actual notice.
The seller argues that the above statute is not dispositive when a true[4] purchase money mortgage is involved and cites Van Eepoel Real Estate Co. v. Sarasota Milk Co., 100 Fla. 438, 129 So. 892, 897 (1930), in support of its position. In that case, the Florida Supreme Court set forth the general rule “that a purchase money mortgage, made simultaneously with the conveyance to the mortgagor [buyer] takes precedence over any lien arising through the mortgagor [buyer], though the latter be prior in point of time.” See also 59 C.J.S. Mortgages, § 246(b) (1949). However, the phrase “point of time” used in Van Eepoel does not appear to us to be synonymous with the “recorded according to law” language found in the statute. In our view, the “point of time” being discussed in Van Eepoel refers to the moment in time that a mechanics lien came into existence. We also do not find that National Title Insurance Company v. Mercury Builders, Inc., 124 So.2d 132 (Fla. 3d DCA 1960), stands for the proposition that an unrecorded purchase money mortgage takes precedence over subsequently recorded mortgages under the facts of this case.
The actual holding of Van Eepoel was that the purchase money mortgagee in that case had not acted with diligence and was responsible for avoidable and unreasonable delays in recording. As a consequence, the Van Eepoel court held the purchase money mortgagee was estopped to assert his priority. (The delay in recording in Van Ee-poel was an “avoidable” five months.) Although there was no unreasonable, avoidable delay in recording the second purchase money mortgage directly attributable to the individual seller/purchase money mortgagee in the case sub judice,[5] such an avoidable delay may well have been occasioned by the acts of her agent for which she might be responsible. It is undisputed in the record that the title company was the seller’s agent. However, that does not mean that fraud or negligence on the part of that agent should be necessarily imputed solely to the seller because the same title company was also the agent for the buyer and the twenty-three investors, although the extent of that agency is not apparent in the record. In their individual responses to the seller’s request for admissions, the investors stated:
This [investor] did not personally investigate the status of title, but such investigation was made by the title insurance company acting as agent on behalf of its [investor].
The record establishes that the seller and the twenty-three investors were all individually innocent of any deliberate wrongdoing in this matter. Any vicarious culpability on the part of the seller because her agent failed timely to record the second *938 purchase money mortgage might well be offset by the fact that at the time the buyer executed all twenty-three of the mortgages to the investors, employing the very same agent, record title was not in that buyer, but remained in the seller. (All twenty-three mortgages were executed between December 8th and December 13th, yet the deed of conveyance was not recorded until December 21st. See footnote 1.) Record title still being in the seller’s name, the investors, through their agent, may well have been on implied notice of the existence of the seller’s interest. See National Title Insurance Company v. Mercury Builders, Inc., 124 So.2d 132 (Fla. 3d DCA 1960). Moreover, no affidavits were secured, nor inquiry made, as to possessory interests. The seller had resided on the property up until the date of sale and continued to reside there for two months after-wards. Her possession was open, obvious and ascertainable upon inquiry. See Florida Power & Light Company v. Rader, 306 So.2d 565 (Fla. 4th DCA 1975). The extent to which the twenty-three investors might be found to have “implied actual notice” of the second purchase money mortgage (See Sapp v. Warner, 105 Fla. 245, 143 So. 648, 650 (1932), which suggests that “constructive notice” is an improper term) depends on their relationship with the title company, the buyer corporation and with Terri D’Addario who prepared the investor’s mortgages. Of course, if they are found to have had implied actual notice of the second purchase money mortgage, their reliance on the recording statute would not be justified. On the other hand, the purchase money mortgagee must explain why she is not bound by the statement in the second purchase money mortgage that it is “subject to certain second mortgage(s) of even date.”
Though undisputed that the title company was the agent of both the purchase money mortgagee and the twenty-three investors, the investors aver that the title company acted as their agent in an entirely separate transaction and that they are not, therefore, charged with notice of the state of the title at the time the twenty-three mortgages were executed, nor of the existence of the second purchase money mortgage executed on the day of the sale even though their agent knew of both of these matters. However, the record reflects that what transpired was a far cry from two unrelated transactions; according to the record, what took place has the appearance of a calculated mortgage scam perpetrated on both the seller and the mortgage investors. The deed, one of the purchase money mortgages and all twenty-three investor mortgages were recorded, sequentially, on the same day, covering the same real estate and processed by the same agent. Likewise the deed, both purchase money mortgages and nine of the twenty-three investment mortgages were executed on the same day as the closing and delivered to the same agent.[6]
Based on the foregoing, we hold that there remain multiple fact issues which preclude the entry of a summary judgment. However, by so holding, we do not negate the possibility that the purchase money mortgagee may eventually triumph. Among the fact issues to be resolved, we list by way of example, but not exclusively:
1. What part did Terri D’Addario play in this matter? Was she the employee or agent of the buyer corporation or of the title company? If not, who paid her to prepare the twenty-three mortgages? Whose agent was she?
2. Are the nine investors, whose mortgages were executed on the same day as the closing, in a superior position to those investors whose mortgages were executed on subsequent days by reason of the language in the second purchase money mortgage which reads:
Subject to certain second mortgage(s)
[[Image here]]
3. Why did the title company fail to record, immediately, the second purchase money mortgage and to what extent was it the agent of the buyer corporation or the mortgage investors? The investors *939 claim that the title company’s only connection with them was the simple task of actual recording of their twenty-three mortgages, but the recording sequence (see footnote 1), suggests it may have had a much greater part to play.
4. How did the relationship between the buyer corporation and the twenty-three investors come about?
We find no merit to any other point on appeal.
REVERSED AND REMANDED.
WALDEN and STONE, JJ., concur.

. This opinion is written, hopefully, more for the benefit of the particular parties and the trial judge, rather than to enhance the body of the law. We also recognize that the answers to some of the posed questions may not be readily ascertainable. For example, the executive vice president of the buyer corporation is, according to the record, and perhaps conveniently, self-exiled to Africa.

.
[[Image here]]
[[Image here]]
Note: The antiquity of the above-described dates, relative to this 1989 opinion, arises because of a stay in bankruptcy. Also, items 7, 8, and 9, only add to 21 because of two assignments.

. The second purchase money mortgage contained a provision that the mortgagee would, in the future, subordinate it to other financing. However, no subordination agreement was ever requested, never mind executed. Moreover, the conditions precedent governing any such subordination were never adhered to, so far as the record shows.

. That is, a mortgage given by the buyer in favor of the seller as part of the purchase price in lieu of cash.

. On the contrary, the seller/purchase money mortgagee used all due diligence and simultaneously with the closing delivered both purchase money mortgages to the Sun Coast Title Company, requested their immediate recording and further requested mortgage title insurance. The title company was therefore mandated to carry out her instructions and the seller’s closing statement prepared by Sun Coast showed a debit of $26.00 to cover the title company’s cost of recording the two purchase money mortgages and a $620 debit to cover the cost of the intangible tax which the title company would have to pay on those two mortgages at the recording window. In addition, the seller did not sit back and do nothing when the purchase money mortgage deeds were not returned to her from the courthouse after the ten day period the title company estimated it would take. When that time period elapsed, she began calling both the title company and the buyer to ascertain the reasons for the delay. Throughout the entire period between December 8, 1983, and January 25, 1984, she had no knowledge about any of the twenty-three intervening mortgages executed in favor of the investors and recorded on December 21, 1983. Of course the twenty-three investors, likewise, had no knowledge of the seller’s second purchase money mortgage.

. The obviously culpable buyer, the equally culpable title company, and Terri D’Addario are not parties to this suit which is merely an action to foreclose a mortgage.